**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**


GEORGE E. PITTINOS,              :

     Plaintiff,                :

vs.                              :        CA 08-0662-KD-C

PROVIDENT LIFE AND               :
ACCIDENT INSURANCE
COMPANY, et al.,                 :

     Defendants.


**<u>REPORT AND RECOMMENDATION</u>**

This cause is before the Magistrate Judge for issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b), on the removal petition (Doc. 1), the motion to dismiss filed by defendants Provident Life and Accident Insurance Company ("Provident") and Unum Group (Doc. 2; *see also* Doc. 3 (brief in support of motion to dismiss state-law claims)), defendant Tera Wiggins' motion to dismiss (Doc. 4; *see also* Doc. 5 (memorandum in support of motion to dismiss)), plaintiff's response to Wiggins' motion to dismiss (Doc. 10), plaintiff's response to Provident and Unnum Group's motion to dismiss and for remand (Doc. 11; *see also* Doc. 12 (brief in opposition to motion to dismiss and for remand)), and the reply filed by

Provident and Unum (Doc.13). Upon consideration of the foregoing pleadings, with attachments, the Magistrate Judge enters the following report and recommendation.

## FINDINGS OF FACT

1.      On July 21, 1980, Radiologists, P.C. entered into a Salary Allotment Agreement with Provident, therein agreeing to pay in full the required premiums for policies issued by Provident to certain individual employees of Radiologists, P.C. and to remit such premiums to this defendant when due. (*See* Doc. 1, Exhibit A to Affidavit of Charles Mitchell) "In consideration of this, the Insurance Company agrees to accept premiums for such policies on a reduced basis in accordance with its published rates for policies where premiums are so deducted and so remitted." (*Id.*)[1]

2.      At that time, Provident's paperwork reflects that it was underwriting all eight radiologists/employees of Radiologists, P.C. and that 100% of the costs was to be paid by Radiologists, P.C. (Doc. 1, Exhibit A to Mitchell aff., Information Sheet for Salary Allotment Plans & Memo from Ann Boleman to Fran Beckstrom) "Radiologists, P.C. originally paid premiums for

---

[1]      "Radiologists, P.C. received a ten [] percent [(10%)] discount on all premiums paid for each policy that was included in the Salary Allotment Agreement." (Doc. 1, Exhibit 3, Affidavit of Charles Mitchell, ¶ 2)

2

two policies for Dr. Pittinos, along with the premiums for policies covering other Radiologists, P.C. employees, pursuant to the Salary Allotment Agreement." (Doc. 1, Exh. 3, Mittchell aff, ¶ 2.; *see also* Doc. 1, Exh. A to Mitchell aff., Document PLARS00014-15; *but cf.* Doc. 12, Affidavit of George E. Pittinos, at 2-5, *infra*)

3.     On November 14, 1983, plaintiff applied for a new disability policy with Provident Life and Accident as a replacement for his existing disability coverage with this defendant. (Doc. 1, Exhibit 1, APPLICATION FOR DISABILITY INSURANCE) The face of the application reflects that no portion of the premium paid for the policy would be included in plaintiff's taxable income; instead, Radiologists, P.C. would pay for all disability coverage. (*Id*. at 3) Thus, the new disability policy "was purchased through the Risk Group established by Radiologists, P.C., pursuant to the . . . Salary Allotment Agreement." (Doc. 1, Exhibit 3, Mitchell aff., at ¶ 3; *but cf.* Doc. 12, Pittinos aff., at ¶¶ 2-5 ("We each individually paid for the premiums for such individually elected disability insurance coverage. They were paid by payroll deduction[2] for the purposes of ease of payment only. The premiums were not

---

[2]     Plaintiff has provided this Court with one payroll slip, for the period ending August 31, 1999, which reflects that for the year 1999 monthly payroll deductions in the amount of $799.45 were made for disability insurance. (Doc. 12, Exhibit 2, Check No. 005384)

paid by Radiologists, PC and Radiologists, PC made no contributions to the costs of the premiums. At the time of my disability, approved by the insurance carrier, I claimed and was provided premium refunds, individually[.] . . .  At no time did the group as a whole pay the premiums and at no time did the group as a whole receive a premium refund upon my disability. In paying the premiums on these policies, we each paid a different amount of premium depending on various factors including age, the amount of coverage, etc. and at no time were we "grouped together" with a payment of a single premium, except for convenience. One option for premium payment was whether such premium was paid pre-tax dollars or post-tax dollars. This significant difference in payment determined whether any benefits under our individual policies were taxable or non-taxable. I paid my premiums with post-tax dollars."))[3] This disability insurance policy, Policy Number 6-334-592140,

---

[3]      While Pittinos may well have paid the premiums on the disability insurance policy issued by Provident, which is the subject of this suit, after March of 1990, the evidence of record suggests nothing other than that prior to March of 1990, Radiologists, P.C. paid all premiums on the subject policy. (*See* Doc. 13, Exhibit 2) The minutes of the Board of Directors of Radiologists, P.C. for March 21, 1990 reflect that the following took place:

> A called meeting was held to discuss disability insurance premiums being paid by the individual Radiologists.

> The board voted unanimously that each Radiologist[] would pay his disability insurance premium in full. **The corporation will no longer pay any portion**.

issued effective February 1, 1984 (Doc. 1, Exhibit 1, Disability Income Policy,

at 3),[4] contains the following Salary Allotment Premium Payment rider on

page 15:

> In consideration of the Salary Allotment Agreement between
> your employer and us, we agree to accept Policy Premiums as
> billed to your employer.

_____

(*Id*., at PLACL02308, MINUTES OF THE BOARD OF DIRECTORS OF RADIOLOGISTS, P.C. (emphasis added)) The Administrator of Radiologists, P.C. informed Robert Finch of The Equitable Assurance Company, by letter dated April 6, 1990, that "as of March 1990 the corporation will no longer pay any portion of the [disability insurance] premium." (*Id*., Letter of April 6, 1990) In turn, Finch informed The Equitable Financial Companies in New York of the decision by the physicians comprising Radiologists, P.C. (*Id*., Letter of April 11, 1990) While there is no such similar correspondence with Provident, and, therefore, the inference could be drawn that Radiologists, P.C. continued to pay the insurance premiums on the disability policies issued by this defendant, in terms of the plaintiff's position, the best that can be said is that this evidence establishes that the corporation stopped paying all disability insurance premiums in March of 1990. In other words, if Radiologists, P.C. voted as a corporation to have each radiologist pay his disability insurance premium in full and informed Equitable (with whom Pittinos had two disability policies (Doc.12, Exhibit 2)) of this fact, it would have been illogical- as well as inconsistent with the 1980 Salary Allotment Agreement and the allotment rider to plaintiff's 1984 rewrite/replacement policy- if Radiologists, P.C. had not have been paying for all of the radiologists' disability policies with Provident. As indicated by Charles Mitchell, the only reason Provident issued coverage for plaintiff in the amount indicated was because Radiologists, P.C. and plaintiff indicated in 1980 (and again in 1983 and 1984) that premiums were being paid by the corporation. (Doc. 13, Exhibit 1, Mitchell supp. aff., at ¶ 2 ("As a result of the Salary Allotment Agreement and plaintiff's indication on the policy application that his employer was paying the premiums with no part of the premiums included in his taxable income, Provident Life issued coverage for Dr. Pittinos in an amount in excess of the benefit amount that the company would have issued to Dr. Pittinos had he been paying the premiums himself. This increase in the allowable monthly benefit amount as a result of Radiologists, P.C.'s involvement was made available pursuant to Provident Life's issue and participation guidelines in effect at the time of the purchase of the policy."))

[4]       Pursuant to the Salary Allotment Agreement between Radiologists, P.C. and Provident, Radiologists, P.C. received a 10% "discount on the premiums for Dr. Pittinos' policy[.]" (Doc. 1, Exhibit 3, Mitchell aff., at ¶ 5)

The conditions of this rider are:

1.    The policy will not continue in force beyond the time for which the premium is paid, subject to the grace period.

2.    If your employer fails to pay the premiums when due because of clerical error or negligence, your insurance under the policy will not be prejudiced.

3.    This rider will be void if:

a.    your employment with your employer ends;

b.    the Salary Allotment Agreement is terminated; or

c.    for any reason, your employer fails to pay premiums.

4.    If this rider is voided, premiums will be due and payable as required in the policy.

(Doc. 1, Exhibit 1, DISABILITY INCOME POLICY, at 15)

4.    Provident has supplied to this Court numerous premium invoices it sent to Radiologists, P.C., for coverage purchased by the risk group. (Doc. 1, Exhibit A to Mitchell aff.)[5] These invoices reflect that Radiologists, P.C. paid all the premiums for the various policies of the risk group members,

---

[5]    "DONNA, THE RISK WAS GIVEN CREDITS (ON 5-84 billing) ON GEORGE PITTINOS (6-441380 $241.82 & 6-441379 $25.43) IN ERROR. THEY TOOK THESE CREDITS ON THE MARCH '84 BILLING. PLEASE ADVISE GROUP IF THEY QUESTION 6-84 BILLING." (Doc. 1, Exhibit A to Mitchell aff., at PLARS00092)

including those related to Dr. Pittinos' rewrite/replacement policy. (*See id.*) In particular, the premium invoice for September of 1987 clearly reflects that it was paid out of Radiologists, P.C.'s business account; the face of the Radiologists, P.C. check reveals that the payment was for Risk # 23475. (*Id.*, at PLARS00098)

5.     The premium invoice was remitted for plaintiff's policy[6] by Radiologists, P.C. every month until he was terminated on September 30, 1999. (*Id.*, at PLARS00119) Radiologists, P.C. notified Provident Life and Accident of the following in paying the premium notice for October of 1999: "EMPLOYEE DOES WISH TO CONTINUE COVERAGE-PLEASE BILL DIRECT AT: GEORGE E. PITTINOS 3950 OLD SHELL ROAD MOBILE, AL 36608." (*Id.*)[7]

---

[6]     The monthly amount paid for Pittinos' policy, as of September of 1999, was $364.65. (*Id.*, at PLARS00119)

[7]     Provident informed plaintiff by letter dated October 14, 1999 that even though his disability policy was no longer being paid through "Risk # 23475, RADIOLOGISTS, PC," he could continue the policy by indicating that he wanted the coverage continued and by specifying his preference for payment of the premium. (Doc. 13, Exhibit A to Supplemental Affidavit of Charles Mitchell) Pittinos indicated that he wished to continue coverage under the disability policy and, eventually, specified that he desired to pay the premium by monthly bank draft. (*See id.*)

Under Provident Life's procedures in effect at the time, Provident Life would refund the premium payments due to be returned pursuant to the waiver of premium provision in the policy to the party listed on the system as paying the premiums as of the date of the refund. Because Dr. Pittinos had changed to direct

6.     As established by plaintiff's attending physician, Daniel L. Koch, M.D., Dr. Pittinos became disabled as of June 15, 1999; he was determined to be entitled to disability insurance benefits under the Provident policy some three months thereafter. (*See* Doc. 12, Exhibit 2 to Affidavit of George E. Pittinos, Unum Letter Dated December 17, 1999) "Provident Life and Accident Insurance Company paid benefits on plaintiff's Provident Life policy up to March 13, 2008, at which time benefit payments stopped because of Provident Life's determination that plaintiff was not eligible for benefits under the policy." (Doc. 1, Exhibit 4, Affidavit of Matthew Carter, at ¶ 3 )[8]

7.     On October 2, 2008, Pittinos filed a three-count complaint against Provident, Unnum, and Tera Wiggins in the Circuit Court of Mobile County, Alabama. (Doc. 1, Exhibit 1, COMPLAINT)

### FIRST CAUSE OF ACTION

5.     The Defendant Provident and Pittinos entered into a contract of insurance being policy number 6-334-592140 providing for the payment by Provident to Pittinos of income in the event of his disability[.]

---

payment on the system, the premium refund was sent directly to him.

(Doc. 13, Mitchell supp. aff., at ¶ 4)

[8]     Disability benefits totaling $6,792.38 monthly were paid to Dr. Pittinos. (*See id.*) Plaintiff's monthly premium ($354.65) was waived during the period he was found to be disabled. (*See id.*)

.     .     .

8.     Defendants have breached the contract by failing and refusing to make further payments to Pittinos as required by the terms of the policy to Pittinos' detriment.

9.     In addition, Pittinos has suffered mental anguish as a result of the Defendants' actions.

WHEREFORE, the premises considered, George E. Pittinos demands judgment against Provident Life and Accident Insurance Company, Unum and Tera Wiggins for breach of contract and for compensatory damages in an amount in excess of the minimal jurisdictional limits of this Court, plus costs.

## SECOND CAUSE OF ACTION

.     .     .

11.     Provident and Unum claim to have readjusted Pittinos' claim but failed and refused to do a proper investigation, failed, in bad faith, to properly adjust his claim, and as a result thereof terminated the disability income payments due him pursuant to the terms of the above-referenced policy.

12.     Provident's and Unum's actions constitute bad faith as the same is defined under the law of the State of Alabama.

13.     Pittinos has suffered the loss of his disability income and has also suffered mental anguish.

WHEREFORE, the premises considered, George E. Pittinos demands judgment against Provident Life and Accident Insurance Company and Unum for compensatory and punitive damages in an amount in excess of the minimal jurisdictional limits of this Court, plus costs.

## **THIRD CAUSE OF ACTION**

.    .    .

15.    Defendants negligently breached the contract hereinabove described.

16.    Pittinos suffered damages as hereinabove described.

WHEREFORE, the premises considered, George E. Pittinos demands judgment against Provident Life and Accident Insurance Company, Unum and Tera Wiggins for compensatory and punitive damages in an amount in excess of the minimal jurisdictional limits of this Court, plus costs.

(*Id.*)

## **CONCLUSIONS OF LAW**

### A.    **Federal Question Jurisdiction.**

1.    The removal statute, 28 U.S.C. § 1441(a), provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court of the United States for the district and division embracing the place where such action is pending." *See also Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353, 1356 (11th Cir. 1996) ("Any civil case filed in state court may be removed by the defendant to federal court if the case could have been brought originally in federal court."), *abrogated on other*

*grounds by Cohen v. Office Depot, Inc.,* 204 F.3d 1069 (11th Cir. 2000). Federal question cases, that is, cases "arising under the Constitution, laws, or treaties of the United States[,]" constitute one category of cases over which a district court, such as this one, has original jurisdiction. 28 U.S.C. § 1331.

      2.    "The federal Employee Retirement Income Security Act of 1974, 88 Stat. 829, as amended, 29 U.S.C. § 1001 *et seq.* (ERISA), comprehensively regulates employee pension and welfare plans." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 732, 105 S.Ct. 2380, 2385, 85 L.Ed.2d 728 (1985); *see also Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 44, 107 S.Ct. 1549, 1551, 95 L.Ed.2d 39 (1987) ("ERISA comprehensively regulates, among other things, employee welfare benefit plans that, 'through the purchase of insurance or otherwise,' provide medical, surgical, or hospital care, or benefits in the event of sickness, accident, disability, or death.").[9] There are two types of ERISA preemption, one which can supply this Court with original subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and the other which does not furnish federal subject-matter jurisdiction. *Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207, 1211 (11th Cir. 1999).

---

[9]    "Congress created ERISA 'to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits.'" *Moorman v. UnumProvident Corp.*, 464 F.3d 1260, 1264 (11th Cir. 2006) (citation omitted).

The first kind is what this circuit has called complete preemption or "super preemption." Superpreemption arises from Congress's creation of a comprehensive remedial scheme in 29 U.S.C. § 1132 for loss or denial of employee benefits. When Congress comprehensively occupies a field of law, "any civil complaint raising this select group of claims is necessarily federal in character" and thus furnishes subject-matter jurisdiction under 28 U.S.C. § 1331. Therefore, federal courts have subject-matter jurisdiction over state-law claims that have been superpreempted, and defendants may remove to federal court those actions that contain such claims.

.        .        .

The second kind of preemption we will call "defensive." It originates in ERISA's express preemption provision, 29 U.S.C. § 1144(a). Defensive preemption provides only an affirmative defense to certain state-law claims. As an affirmative defense, defensive preemption does not furnish federal subject-matter jurisdiction under 28 U.S.C. § 1331; "a cause of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of federal law." On the other hand, defensive preemption does require dismissal of state-law claims.

.        .        .

ERISA superpreemption exists only when the "plaintiff is seeking relief that is available under 29 U.S.C. § 1132(a)." Regardless of the merits of the plaintiff's actual claims (recast as ERISA claims), relief is available, and there is complete preemption, when four elements are satisfied. First, there must be a relevant ERISA plan. Second, the plaintiff must have standing to sue under that plan. Third, the defendant must be an ERISA entity. Finally, the complaint must seek compensatory relief akin to that available under § 1132(a); often this will be a claim for benefits due under a plan.

*Id.* at 1211-1212 (internal citations and footnote omitted); *see also*

*Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63-64, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987) ("Federal pre-emption is ordinarily a federal defense to the plaintiff's suit. As a defense, it does not appear on the face of a well-pleaded complaint, and, therefore, does not authorize removal to federal court. . . . One corollary of the well-pleaded complaint rule developed in the case law, however, is that Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character."); *Whitt v. Sherman Int'l Corp.,* 147 F.3d 1325, 1329 (11th Cir. 1998) ("The doctrine of 'complete preemption' or 'super preemption' [] qualifies the general well-pleaded complaint rule. Where Congress preempts an area of law so completely that any complaint raising claims in that area is necessarily federal in character, super preemption applies, and federal jurisdiction exists, even if the face of the complaint does not plead federal claims. Super preemption converts state law claims into federal claims for purposes of the well-pleaded complaint rule, allowing a defendant to remove the case to federal court. As this Court has recognized, the Supreme Court has held that Congress created super preemption in ERISA, which provides the exclusive cause of action for the recovery of benefits governed by an ERISA plan. State law claims that seek relief available under ERISA are

13

recharacterized as ERISA claims and therefore arise under federal law.") (internal citations omitted); *Engelhardt v. Paul Revere Life Ins. Co.*, 139 F.3d 1346, 1353 (11th Cir. 1998) ("[U]nder the 'complete preemption' doctrine, 'Congress may preempt an area of law so completely that any complaint raising claims in that area is necessarily federal in character and therefore necessarily presents a basis for federal court jurisdiction.' . . . If a state law claim is completely preempted, courts are required to recharacterize the claim as one arising under federal law for purposes of determining removal jurisdiction. . . . It is well settled that 'Congress [] accomplished [] "complete preemption" in 29 U.S.C. § 1132(a), which provides the *exclusive* cause of action for the recovery of benefits governed by an ERISA plan.' . . . As a result, claims that fall within the scope of § 1132(a) are treated as arising under federal law and thus may be removed to federal court. As explained in *Kemp*, removal jurisdiction in cases such as this one 'turns on whether the plaintiff[] [is] seeking relief that is available under 29 U.S.C. § 1132(a).").

3.    The pivotal issue in this case, as reflected in plaintiff's brief in opposition to the motion to dismiss, is whether there is a relevant ERISA plan. (*See* Doc. 12)[10]

---

[10]    There is no dispute that plaintiff has standing to sue, *compare Provident Life & Accident Ins. Co. v. Sharpless,* 364 F.3d 634, 639 (5th Cir. 2004) ("[S]hareholders in a multiple-

> [A]n "employee welfare benefit plan" governed by ERISA is any (1) "plan, fund or program," (2) established or maintained (3) by an employer, (4) to provide beneficiaries (5) [disability] benefits through an insurance policy.
>
> .    .    .
>
> An ERISA plan exists whenever there are "intended benefits, intended beneficiaries, a source of financing, and a procedure to apply for and collect benefits."
>
> .    .    .
>
> A plan is "established" when there has been some degree of implementation by the employer going beyond a mere intent to confer a benefit.

*Butero, supra,* 174 F.3d at 1214; *see also Donovan v. Dillingham,* 688 F.2d 1367, 1371 & 1373 (11th Cir. 1982) ("By definition, [] a welfare plan requires (1) a 'plan, fund, or program' (2) established or maintained (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits . . . (5) to participants or their beneficiaries. . . . In summary, a 'plan, fund, or program' under ERISA is

---

shareholder corporation . . . are employees under ERISA.") *with* 29 U.S.C. § 1132(a)(1)(B) ("A civil action may be brought [] by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan [or] to enforce his rights under the terms of the plan[.]"), that defendants are ERISA entities, and that Pittinos' complaint seeks compensatory relief akin to that available under 29 U.S.C. § 1132(a), namely benefits under the plan, *see Butero, supra*, 174 F.3d at 1213 ("[T]he claims [] of bad faith refusal to pay and breach of contract [] pursue . . . payment of [disability benefits].").

established if from the surrounding circumstances a reasonable person can

ascertain the intended benefits, a class of beneficiaries, the source of financing,

and procedures for receiving benefits. To be an employee welfare benefit plan,

the intended benefits must be health, accident, death, disability, unemployment

or vacation benefits . . .; the intended beneficiaries must include union

members, employees, former employees or their beneficiaries; and an

employer or employee organization, or both, and not individual employees or

entrepreneurial businesses, must establish or maintain the plan, fund, or

program.").[11]

---

[11]    To the extent it is plaintiff's intent to argue that the Provident disability policy at issue here is not part of an ERISA plan because it falls within ERISA's regulatory safe harbor, such argument must fail.

The [regulatory safe harbor] excepts from the definition of "employee welfare benefit plan" certain "group or group-type insurance program[s]" "offered by an insurer to employees." 29 C.F.R. § 2510.3-1(j). For the program to qualify for the exception, four elements must be satisfied:

(1) No contributions are made by an employer or employee organization;

(2) Participation [in] the program is completely voluntary for employees . . .;

(3) The sole functions of the employer . . . with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

(4) The employer . . . receives no consideration in the form of cash or otherwise in connection with the program.

4.      With respect to the first element, the evidence in this case is clear

_____

*Butero, supra*, 174 F.3d at 1213. In this case, not only did Radiologists, P.C. make contributions to the plan, the corporation paying premiums every month for all of the radiologists' disability policies with Provident (*see* Doc. 1, Exhibit A to Mitchell aff. (pursuant to the 1980 Salary Allotment Agreement, to which plaintiff's 1984 rewrite/replacement policy remained subject, Radiologists, P.C. agreed to pay in full the premiums for all policies covered by the agreement and invoices from Provident to Radiologists, P.C. reflect that Radiologists, P.C. paid plaintiff's monthly insurance premiums), but, as well, the corporation, because it made those premium payments, received a 10% discount on same, *see, e.g., Stone v. Disability Management Services, Inc.,* 288 F.Supp.2d 684, 692 (M.D. Pa. 2003) ("[T]he insurance agent for Stone Office [] testified that the plaintiff and other shareholders of Stone Office received a 10% discount on their disability policy premiums, and that the discount was only available because Stone Office employees were grouped together on one statement bill. . . . The safe harbor's first exclusionary factor does not apply because Stone Office made a 'contribution' to the disability insurance by providing the plaintiff a benefit he could not have received as a non-employee. Accordingly, we hold that the disability insurance plan does not fall within the scope of the 'safe harbor' regulations issued by The Department of Labor."). Even if this Court was to disregard such evidence with respect to the first element, there remains evidence of record which establishes that Radiologists, P.C.'s activities went beyond refraining "from *any* functions other than permitting the insurer to publicize the program and collecting premiums." *Butero,* 174 F.3d at 1213 (emphasis in original). Radiologists, P.C., clearly endorsed this ERISA plan by entering into the Salary Allotment Agreement (to which plaintiff's 1984 rewrite/replacement policy was subject) with Provident, wherein it contractually promised to pay in full the premiums for the policies and to remit such premiums to Provident when due, and received a 10% discount on the premiums due. In addition to receiving the 10% discount on premiums, the corporation also benefitted its participating employees/radiologists when it entered into the Salary Allotment Agreement because more coverage was issued to the employee participants than would have been allowed in absence of the agreement. Finally, plaintiff's employer represented to Provident that it was paying the premiums and that no part of the premium payments was included in the participating employees' taxable income. The undersigned recommends that the Court find that the conduct of Radiologists, P.C. went beyond that allowed for a plan to fall within the confines of ERISA's safe harbor regulation. Therefore, safe harbor should be barred.

that Radiologists, P.C. established a plan under ERISA when it entered into the

1980 Salary Allotment Agreement with defendant Provident. The face of the

1980 agreement reveals that the source of financing for the disability insurance

would be Radiologists, P.C., who agreed to "pay in full the required premiums

for such policies and to remit such premiums to [Provident Life] when due."

(Doc. 1, Exhibit A to Mitchell aff.) In addition, plaintiff's 1984

rewrite/replacement disability policy, the policy at issue in this case, contains

a salary allotment premium rider subjecting it to the 1980 Salary Allotment

Agreement (Doc. 1, Exhibit 1, DISABILITY INCOME POLICY, at 15 ("In

consideration of the Salary Allotment Agreement between your employer and

us, we agree to accept Policy Premiums as billed to your employer.") and

Pittinos' November 14, 1983 application for his rewrite/replacement policy

specifically provided that Radiologists, P.C. would pay for all disability

coverage with no portion of the premium to be included in his taxable income

(Doc. 1, Exhibit 1, APPLICATION FOR DISABILITY INSURANCE).[12] In

---

[12]     The fact that plaintiff paid the premiums after his termination reflects nothing
more or less than that which was contemplated in the salary allotment premium payment rider
(*see* Doc. 1, Exhibit 1, DISABILITY INCOME POLICY, at 15 ("This rider will be void if . . .
your employment with your employer ends[.] . . . If this rider is voided, premiums will be due
and payable as required in the policy.")) and amounts to nothing more than a continuation of the
policy issued under the ERISA-covered plan, *see Griggers v. Equitable Life Assurance Society
of the United States*, 343 F.Supp.2d 1190, 1196 (N.D. Ga. 2004) ("[I]t is undisputed that (1) the
Policy was issued through Hemlock's ERISA-covered plan; and (2) the Policy, its coverage and

exchange for entering into the Salary Allotment Agreement, Radiologists, P.C. "paid a lower premium on its employees' behalf and the employees were eligible for a higher disability benefit." *Crooms v. Provident Life & Accident Ins. Co.*, 484 F.Supp.2d 1286, 1298 (N.D. Ga. 2007). The intended benefits of the 1980 Agreement (and 1984 salary allotment premium payment rider) were the disability benefits provided under all the disability insurance policies. The class of beneficiaries included plaintiff and, as of 1980, seven other radiologists employed by Radiologists, P.C. who obtained disability policies. Finally, each radiologist employee of Radiologists, P.C. received copies of his disability policies in 1980, and upon rewrite/replacement, and those policies explained the procedures for receiving disability benefits. (*See, e.g.,* Doc. 1, Exhibit 1, DISABILITY INCOME POLICY) Accordingly, there is an ERISA plan because a reasonable person could readily ascertain from the surrounding circumstances the source of financing, the intended benefits, a class of

_____

its premiums remained the same after Plaintiff resigned her employment and assumed responsibility for paying the premium. Under these circumstances, the plan, and the Policy issued under it, necessarily are covered by ERISA. Plaintiff's argument that ERISA ceased to apply once she began paying the Policy premium is inconsistent with precedent in this Circuit, and, if accepted, would invite the conflicting state and local regulation of employee benefit plans that Congress sought to prevent by enacting ERISA."). Moreover, the fact that the defendants returned to plaintiff premiums paid that were subject to the waiver of premium provisions of the subject policy reflects nothing other than Provident's policy to refund same "to the party listed on [its] system as paying the premiums as of the date of the refund[,]" which, in this case, was Pittinos. (Doc. 13, Supplemental Affidavit of Charles Mitchell, at ¶ 4)

beneficiaries, and procedures for receiving benefits.

5.    As explained in *Crooms, supra*, "[t]he second requirement, that the plan be 'established or maintained' by the employer is a disjunctive one. 'A showing of either one is sufficient to give rise to ERISA's application.'" 484 F.Supp.2d at 1298 (citation omitted). "A plan is 'established' when there has been some degree of implementation by the employer going beyond a mere intent to confer a benefit." *Butero, supra,* 174 F.3d at 1214 (citations omitted). The evidence in this case establishes that the 1980 Salary Allotment Agreement was signed by one of plaintiff's fellow radiologists for "Radiologists, P.C." and this agreement was clearly, on its face, between Radiologists, P.C. and Provident. The paperwork associated with the agreement reflects that 100% of the cost of the plan was to be paid by Radiologists, P.C. for all eight participating employees/radiologists. Additionally, plaintiff's 1984 rewrite/replacement disability policy contained a salary allotment rider specifically subjecting it to the 1980 agreement. Radiologists, P.C. received monthly invoices for all of the disability policies under the Salary Allotment Agreement which it duly paid.[13] Any changes

---

[13]    Even assuming, for the sake of argument, that plaintiff began paying the premiums for the subject disability policy beginning in 1990, ERISA would still apply to his claims. *See Massachusetts Cas. Ins. Co. v. Reynolds,* 113 F.3d 1450, 1453 (6th Cir. 1997) ("Mr. Reynolds . . . contends [] that the disability insurance coverage purchased by Navarre was a

respecting the different policies and employee status were noted by office staff for Radiologists, P.C. on the monthly invoices. The Magistrate Judge is of the opinion that the foregoing shows that Radiologists, P.C. established a plan under ERISA.

6. This Court should determine, as did the court in *Crooms, supra*, that "[r]equirements three, four and five for the plan to qualify as an employee benefit plan under ERISA are self-evident in this case, as they are in the majority of cases." 484 F.Supp.2d at 1298 (citation omitted). More specifically, Radiologists, P.C. was (and is) an employer, plaintiff making no argument to the contrary; the Salary Allotment Agreement was entered into for the purpose of providing benefits; and the agreement was entered into for the benefit of Radiologist, P.C.'s employee/radiologist-participants.

7. In light of the foregoing, this Court should find that plaintiff's

---

'group policy,' and that when he left Navarre and began making the premium payments himself the policy was 'converted' to an individual policy not governed by ERISA. . . . Because Mr. Reynolds' coverage remained in effect under the same policy that had been in force since January 1, 1990, his post-employment coverage bears a strong resemblance to the 'continuation coverage' that the plaintiff in *Mimbs* enjoyed for a limited period of time following the termination of his employment. The *Mimbs* court held that any claim under the continuation coverage was preempted by ERISA. . . . If the logic of this holding is followed here-and we see no reason why it should not be-it compels the conclusion that Mr. Reynolds' claims against Massachusetts Casualty are likewise governed by ERISA."); *Jaffe v. Provident Life & Acc. Ins. Co.,* 2000 WL 349750, *4 n.8 (S.D. Fla. 2000) ("We agree with Provident that Plaintiff's commencing payment of his own premiums in 1998 does not affect our finding that the employer established or maintained the plan.")

1984 rewrite/replacement disability policy "was part of an 'employee welfare benefit plan' governed by ERISA. That means that [there] is a relevant ERISA plan, and that all elements of superpreemption are satisfied for [plaintiff's] claims." *Butero, supra,* 174 F.3d at 1215. Therefore, "by virtue of the complete preemption doctrine," Pittinos' state law claims must be recast as ERISA claims that were removable to federal court. *Engelhardt, supra*, 139 F.3d at 1354. Because this Court has subject-matter under 28 U.S.C. § 1331, *Butero, supra*, plaintiff's motion to remand (Doc. 11) should be denied.

8.      It is clear in this circuit that because plaintiff's claims are completely preempted, they are also defensively preempted.[14] *Butero, supra*, 174 F.3d at 1214 ("If the plaintiff's claims are superpreempted, then they are also defensively preempted. . . . The district court thus properly dismissed both plaintiffs' claims with leave to refile."). Accordingly, the undersigned recommends that plaintiff's state-law claims be dismissed, with leave to re-file any exhausted ERISA claims.[15]

---

[14]    "Defensive preemption defeats claims that seek relief under state-law causes of action that 'relate to' an ERISA plan." *Butero, supra*, 174 F.3d at 1215 (citations omitted).

[15]    Exhaustion of administrative remedies is a prerequisite to bringing a suit under the Employee Retirement Income Security Act of 1974 ("ERISA") challenging the denial of benefits under an ERISA plan. *Counts v. American General Life & Accident Ins. Co.*, 111 F.3d 105, 108 (11th Cir. 1997). "We apply this exhaustion requirement to both ERISA claims arising from the substantive provisions of the statute, and ERISA claims arising from an employment and/or pension plan agreement." *Perrino v. Southern Bell Telephone & Telegraph Co.*, 209 F.3d

## B.    Diskussion Jurisdiction.[16]

9.      Federal courts may exercise diversity jurisdiction over all civil actions where the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different states.  28 U.S.C. § 1332(a)(1).   However, "[b]ecause removal jurisdiction raises significant federalism concerns, federal courts are directed to construe removal statutes strictly. . . . Indeed, all doubts about jurisdiction should be resolved in favor of remand to state court."  *University of South Alabama v. American Tobacco Co.,* 168 F.3d 405, 411 (11th Cir. 1999).

10.      "[T]he party invoking the court's jurisdiction bears the burden of proving, by a preponderance of the evidence, facts supporting the existence of federal jurisdiction."  *McCormick v. Aderholt*, 293 F.3d 1254, 1257 (11th Cir. 2002); *see also Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 n.4 (11th Cir. 1998) (citation omitted) ("[T]he removing party bears the burden of demonstrating federal jurisdiction."); *Tapscott, supra* ("A removing

---

1309, 1315-1316 n.6 (11th Cir. 2000); *see also Counts, supra*, 111 F.3d at 109 ("We have consistently stated that the exhaustion requirement applies both to actions to enforce a statutory right under ERISA and to actions brought to recover benefits under a plan.").

[16]      Should there be disagreement with the decision that federal question jurisdiction has been established, i.e. that plaintiff's state-law claims are preempted by ERISA, such a determination would not divest this Court of jurisdiction since it is decided, alternatively, that this Court may exercise diversity jurisdiction.

defendant has the burden of proving the existence of federal jurisdiction."). Therefore, in this case, the burden is on the removing defendants to establish complete diversity, that is, the plaintiffs are all diverse from the  defendant, *Triggs, supra*, 154 F.3d at 1287 (citation omitted),[17] and, in addition, to establish by a preponderance of the evidence that the amount in controversy more likely than not exceeds the $75,000 jurisdictional requirement, *Tapscott, supra*, 77 F.3d at 1357 ("[W]e hold where a plaintiff has made an unspecified demand for damages in state court, a removing defendant must prove by a preponderance of the evidence that the amount in controversy more likely than not exceeds the $50,000 jurisdictional requirement."). More specifically, "the removing defendant[s] must establish the amount in controversy by '[t]he greater weight of the evidence, . . . [a] superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other.'" *Lowery, infra*, 483 F.3d at 1209, quoting *Black's Law*

---

[17]        Plaintiff concedes that the motion to dismiss filed by Alabama resident defendant Tera Wiggins (Doc. 4) is due to be granted (Doc. 10). One effect of the granting of this motion (Doc. 4), which the undersigned recommends, is that with Tera Wiggins no longer a defendant the plaintiff is diverse from all remaining defendants (*see* Doc. 1, at ¶¶ 20-22 ("Plaintiff is a resident citizen of the State of Alabama. . . . Provident Life is a Tennessee corporation with its principal place of business in Tennessee. [] Unum Group is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Tennessee.")). Therefore, complete diversity exists.

*Dictionary* 1220 (8th ed. 2004).

11.     The undersigned is of the opinion that the removing defendants have established by a preponderance of the evidence that the amount in controversy in this case more likely than not exceeds the $75,000 jurisdictional requirement. This Court's analysis of this issue is necessarily informed by the Eleventh Circuit's recent decision in *Lowery v. Alabama Power Co.,* 483 F.3d 1184 (2007), *cert. denied sub nom. Hanna Steel Corp. v. Lowery*, ___ U.S. ___, 128 S.Ct. 2877, 171 L.Ed.2d 812 (2008).[18]

> [W]e conclude that the removal-remand scheme set forth in 28 U.S.C. §§ 1446(b) and 1447(c) requires that a court review the propriety of removal on the basis of the removing documents. If the jurisdictional amount is either stated clearly on the face of the documents before the court, or readily deducible from them, then the court has jurisdiction. If not, the court must remand. Under this approach, jurisdiction is either evident from the removing documents or remand is appropriate.
>
> .     .     .
>
> [U]nder § 1446(b), in assessing the propriety of removal, the court considers the document received by the defendant from the plaintiff-be it the initial complaint or a later received paper-and determines whether that document and the notice of removal unambiguously establish federal jurisdiction. This inquiry is at the heart of a case, such as the one before us, in which the plaintiffs challenge removal by filing a timely motion to remand

---

[18]     "Although *Lowery* was decided in a Class Action Fairness Act case, its holdings are not limited to that context." *Carswell v. Sears, Roebuck & Co*., 2007 WL 1697003, *1 n.1 (M.D. Ala. 2007) (citation omitted).

under § 1447(c). In assessing whether removal was proper in such a case, the district court has before it only the limited universe of evidence available when the motion to remand is filed-i.e., the notice of removal and accompanying documents. If that evidence is insufficient to establish that removal was proper or that jurisdiction was present, neither the defendants nor the court may speculate in an attempt to make up for the notice's failings. The absence of factual allegations pertinent to the existence of jurisdiction is dispositive and, in such absence, the existence of jurisdiction should not be divined by looking to the stars.

.     .     .

Though the defendant in a diversity case, unlike the plaintiff, may have no actual knowledge of the value of the claims, the defendant is not excused from the duty to show by fact, and not mere conclusory allegation, that federal jurisdiction exists. Indeed, the defendant, by removing the action, has represented to the court that the case belongs before it. Having made this representation, the defendant is no less subject to Rule 11 than a plaintiff who files a claim originally. Thus, a defendant that files a notice of removal prior to receiving clear evidence that the action satisfies the jurisdictional requirements, and then later faces a motion to remand, is in the same position as a plaintiff in an original action facing a motion to dismiss.

*Id.* at 1211, 1213-1215 & 1217 (internal citations and footnotes omitted).

12.     In accordance with *Lowery*, therefore, this Court looks solely to plaintiff's complaint and the notice of removal to assess the propriety of removal. The undersigned quickly discerns that the jurisdictional amount of $75,000 is nowhere clearly stated on the face of the complaint. However, the

undersigned recommends that the court find that such an amount is readily[19]

deducible from the removal petition. In making this determination, the

undersigned relies upon the analysis set forth in *Kok v. Kadant Black Clawson,*

*Inc.,* 274 Fed.Appx. 856, 867 (11th Cir. 2008) as persuasive authority.

> Kok filed a motion to remand and to disavow any recovery
> beyond $74,999, but he did not assert that the amount in
> controversy was less than the jurisdictional threshold when he
> filed his complaint. Kadant opposed Kok's motion and
> calculated Kok's recovery for back pay from the date of his
> termination to trial to equal $94,963. . . . To support its
> calculation, Kadant submitted Kok's W-2 form that listed Kok's
> gross pay for the first 11 months of the year at $75,823.66 and
> an affidavit that stated that Kok's benefits within the same
> period were valued at $7,944.71. The district court correctly
> concluded that Kadant established that, at the time of removal,
> Kok's complaint for damages exceeded the amount in
> controversy required for diversity jurisdiction.

In their removal papers (and attachments) the defendants have established that

when plaintiff's disability benefits were terminated under the policy on March

13, 2008, he was receiving monthly disability benefits of $6,792.38 and a

waiver of premium of $354.65 monthly.  (*See* Doc. 1, at ¶ 32 & Exhibit 4,

Affidavit of Matthew Carter) Plaintiff contends in his complaint that the

defendants "breached the contract by failing and refusing to make further

payments to [him] as required by the terms of the policy" and he seeks

---

[19]     Readily means "easily" or "promptly." WEBSTER'S II, NEW RIVERSIDE
UNIVERSITY DICTIONARY, at 974 (1994).

damages for that breach, including, among other items, the monthly benefits and waiver of premium. (*See* Doc. 1, Exhibit 1, COMPLAINT, at ¶¶ 5-9 & 14-16) The Magistrate Judge is of the opinion that in light of plaintiff's present age (68), it is reasonable to expect that he will live and be entitled to benefits through the anticipated date of trial, which the parties have estimated to be April of 2010 (Doc. 14, ¶ 2). If plaintiff succeeds in establishing that Provident and/or Unum breached the contract at the trial of this cause, therefore, he will be entitled to recover of these defendants back benefits totaling approximately $171,528.72.[20]

13.     Based upon the foregoing, the undersigned recommends that the Court conclude that the removing defendants have established that, at the time of removal, Pittinos' complaint for damages exceeded the amount in controversy required for diversity jurisdiction.

## CONCLUSION

In light of the foregoing, the undersigned **RECOMMENDS** that plaintiff's motion to remand this case to the Circuit Court of Mobile, County (Doc. 11) be **DENIED**. This Court  has subject-matter jurisdiction under 28 U.S.C. § 1331 over plaintiff's state-law claims by virtue of the complete

---

[20]     Under this analysis, the Court has no need to consider any other compensatory or punitive damages plaintiff claims he is entitled to recover of the defendants.

preemption doctrine. The motion to dismiss filed by defendants Provident Life and Accident Insurance Company and Unum Group (Doc. 2) should be **GRANTED** because plaintiff's state-law claims are also defensively preempted. The Court's dismissal of plaintiff's state-law claims should be without prejudice and plaintiff should be given leave to re-file any and all exhausted ERISA claims he may have against the remaining defendants. Alternatively, the Magistrate Judge recommends that the Court find that the removing defendants have established by a preponderance of the evidence that the amount in controversy in this case exceeds $75,000, exclusive of interest and costs; therefore, this Court may properly exercise diversity jurisdiction.[21]

The instructions which follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

**DONE** this the 21st day of January, 2009.

  s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**

---

[21]     It is also recommended that the motion to dismiss filed by defendant Tera Wiggins (Doc. 4) be **GRANTED**.

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND
RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND
<u>FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>**

l.      ***Objection***.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the Clerk of this court.  Failure to  do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).  The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      ***Transcript (applicable Where Proceedings Tape Recorded)***.  Pursuant to 28 U.S.C. § 1915 and FED.R.CIV.P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

　s/WILLIAM E. CASSADY
UNITED STATES MAGISTRATE JUDGE